Good morning, everyone. Judge Jordan and I are pleased to be joined here today by Senior District Judge Bill Yawn from the Eastern District, Pennsylvania. We welcome you, Judge. My pleasure. And the first case on today's schedule is American Capital Equipment and Skinner Engine Company debtors. Mr. Waxman. May it please the Court. My name is Seth Waxman. I represent the Hartford insurance entities in this litigation, and I'll be presenting oral argument on behalf of all appellants. With the Court's permission, I'd like to save five minutes of my time for rebuttal. That request will be granted. At the Court's request, we've exchanged letter briefs on the issue of finality. If the Court has any questions, of course, the lawyers are here to answer them. I was planning to simply go directly to the merits, unless it's the Court's pleasure otherwise. I do have a few questions about finality, Mr. Waxman, if I may. Let me take it through your letter brief, if I could. Page 3. Yes, Judge Jordan. And you say there, accordingly, this is the conclusion of the first carryover paragraph on that page. It says, accordingly, in bankruptcy, each adversary proceeding or contested matter is a discrete unit and an order finally resolving it is appealable. Which makes, of course, some sense, but we're not talking about an adversary proceeding here. We're talking about the denial of a motion to dismiss, and you've asserted that that is a proceeding in and of itself. Yes, that's correct. And I'm trying to get my mind around that concept. What makes a motion to dismiss something of the same character as an adversary proceeding, where you actually can have a complaint and an answer and a whole series of issues that are in dispute between two people, or even like the claim of a creditor, where you can have a discrete amount of money or a piece of property that's at issue and people can be fighting over the right to get it? This is a denial of a motion to dismiss. How does that stand on a par with an adversary proceeding? Well, with respect, this Court's precedents and those of other circuits, including prominently then Judge Breyer's opinion for the First Circuit and SACO, have explained that in the context of bankruptcy, which is really an umbrella of proceedings, any contested action or adversary proceeding is a discrete proceeding as to which an appeal, a denial or a grant is automatically appealable. And as our letter indicates, there are any number of precedents in this Court involving denial of motions of contested matters, motions to dismiss for the absence of good faith and the like, that have been deemed immediately appealable by this Court as a matter of course, and following the flexible finality jurisprudence expressed by this Court in Myrtek. A motion to dismiss in a bankruptcy proceeding, or motion to dismiss for bad faith, is an independent contested matter. It's not ancillary to any other proceedings, and it seeks specific substantive relief from the debtor. And this Court's jurisprudence is extremely rich in SGL carbon. Right. I'm aware of the jurisprudence of this circuit, which I think your opponent has pointed out, stands virtually alone. We've got an Eighth Circuit case out there that cites the Christian case, but otherwise the Third Circuit's isolated, isn't it, among all the circuits that have looked at this? Well, I don't know that there are that many circuits that line up. The Ninth Circuit and the Seventh Circuit are squarely against us, as this Court recognized in Brown and in subsequent cases. The Fifth Circuit case that they cite has not been followed in other Fifth Circuit cases. The Second Circuit decision in the original case was not, didn't raise the question directly. The issue came up on whether the Court of Appeals would issue a mandamus order directing the District Court to exercise an appeal over an interlocutory matter. And the Fourth Circuit case that they cite does not stand for the proposition. I really do think if you were lining up the courts, certainly the Eighth Circuit and this Court stand on the side of finality for the denial of a motion to dismiss, including a motion to dismiss for bad faith, and the Seventh and the Ninth stand on the other side. But this circuit's precedent, I mean, the Court could, of course, the court en banc could reconsider its precedent. But this would be a particularly poor case to do it because they did not, I'm sorry, at the time that we filed this motion to dismiss, we also filed a motion for relief from the automatic stay so that we could file in state court a coverage action. They were both denied. We did not, the former would have been appealable under this court's jurisprudence. We did not appeal it on reliance on this court's repeated precedent that that relief would be subsumed by the motion to dismiss. What would prevent this court, if it chose to, and I certainly don't presume to speak for the court, but you said this would be a poor case for reconsidering it. If that's the real objection to it, what would prevent this court from permitting, in light of the peculiar circumstance you've described, the objectors here, the insurance companies, the losing party below, from pursuing that appeal? Is there capacity in our rules and do we have the authority to say, look, you didn't pursue that in reliance on that or is that foreclosed? Well, I think the time has long since passed, and in fact, as the district judge in this case noticed, the time had long since passed for the debtor to contend in the district court that there was no jurisdiction to appeal. Would there ever be, I guess? Too much of a hypothetical, but the roadblock you're proposing, I mean, if the way you could say, hey, don't ever overturn this, is to say we relied on past precedent, you'd never overturn anything. People rely on past precedent that gets overturned. Well, I'm simply pointing out to the court that there is a particularly strong form of reliance here, where we could have appealed the other denial. We didn't in reliance on this court's repeated precedent, and our opponents, also in reliance on that precedent, did not object at the time we took that appeal to the district court to our assertion that the district court had authority under 158D to hear an appeal from a final decision, judgment, or order, or decree entered under Section 158A. But if we were arguing about this with respect, Judge Jordan, as an original matter, I actually think for the reasons that Justice Breyer, then Judge Breyer, gave in Sacco, this court's jurisprudence is absolutely correct, and I'd be prepared to argue it for the reasons that we stated in our letter and others. I may not be able to presume on my colleagues' graces for long enough to engage you as long as I'd like on that, but I would like you to address Seventh Circuit jurisprudence, which takes a direct shot at the Third Circuit. Judge Posner is very, very direct in saying that the rule the Third Circuit has got is, in effect, unworkable. Woolly is, I think, the word he used. It's imprecise. It doesn't lead to the kind of decision-making that jurisprudence ought to, when people are arguing about where to argue instead of arguing about the merits. And he distinguishes specifically between adversary actions and contested claims, on the one hand, and the sort of basis that you're advancing here, which is a denial of a motion to dismiss stands as an independent proceeding in its own right. This is the Lopez case, as you know. Can you, for a moment, address his reasoning in that case? Yes, I think he's wrong for the reasons that this court gave in SGL Carbon, in Chief Judge Sirica's opinion, and Justice Judge Breyer's opinion in Sacco. That is, we have a – the predicate of our motion is that we are under the affirmative restraints that Congress has placed on parties in interest in a bankruptcy proceeding. And if that proceeding is not going forward in good faith, in the objective good faith standard that Chapter 11 contemplates and that this court has explicated, we are entitled to be free of those restraints. In SGL Carbon, this court not – I mean, I guess to get right to your point, in Brown itself, this court recognized that the Seventh Circuit's jurisprudence went the other way. But what this court said is there is an independent value in freeing parties from the many restraints of a bankruptcy proceeding, including the automatic stay and the stay on efforts to recover on judgments in trial courts, to litigate a final denial of a motion to dismiss for good faith. And one of the arguments that was made in SGL Carbon was, well, there's going to be a plan of reorganization. And you can object if the plan is approved. You can object at that time, and you can object from the start. And what this court said in footnote 19 of SGL Carbon is, is if the bankruptcy petition properly belongs before the bankruptcy court in a case such as where a debtor attempts to – in a case such as – Mr. Waxman, I'd ask you to wrap up on this point. And I'm going to give you 10 additional minutes since we were the ones that asked you to speak about this jurisdiction issue. How about wrapping up on this? Sure. I'll just simply finish the court sentence. Proceedings like this in bad faith should end well before formal consideration of the bankruptcy proceedings or the plan. And that's why, as an original matter, I think it's correct. We'll also add 10 minutes to the FLE's time. Now, with respect to the merits, the issue in this case is whether a company that has no ongoing business and whose assets have already been liquidated may invoke Chapter 11 for the avowed purpose of creating a better forum for tort claimants against it. Was that the case here when the petition was filed? It was not. There were assets that had not yet been liquidated. And there was also an assertion by the debtors that they were going to have an ongoing business. That is, they were going to continue. And this would be – there was – the petition was pursuing a valid reorganizational purpose and a liquidation purpose. But now there is no prospect of either. There is no pretense that this company is reorganizing or will have – Okay. But isn't the issue – isn't the – when you cut through all this, isn't the bottom line is whether or not the bankruptcy proceeding will maximize the value of the estate? Isn't that really the bottom line here? That is the bottom line in this case. Why is that not the case? Because the estate consists of $35,000 of cash and some liability insurance policies. The value of those policies for bankruptcy purposes must be the same value that those policies would have outside bankruptcy. That is Hornbook Supreme Court precedent. And the only way – the only way that any – whatever has to be paid under tort law will be paid. And there is some present value of those policies. But what this estate – what these – what the debtors are trying to do is not to increase the assets of the estate. They are working to increase the liabilities of the estate because – Well, but don't you have a separate proceeding in which you have the opportunity to challenge that? I mean, if there's not coverage here, your clients are going to prevail. It's going to be decided in a separate proceeding, a proceeding separate and apart from the bankruptcy proceeding here. That's correct. The point is, as this – I mean, what the bankruptcy judge said is any number of times, I totally understand your motion. And he called this bankruptcy proceeding a sham and collusion. But he didn't want to rule on it. His view was we should pursue an adversary proceeding that another insurance company had brought with respect to its coverage. And that was wrong for two reasons. Are you implying that there's a finding of fact? You're not arguing that there's a finding of fact by the bankruptcy judge that this was a sham? Because there's – He didn't enter any findings of fact when he denied our – And he didn't grant your motion to dismiss. He denied our motion to dismiss for the express purpose of allowing us to appeal it to the district court with whatever proceedings might be necessary in front of this court. But, Judge Fisher, I just want to make my point clear here. First of all, the issues in the coverage litigation are going to be tied to the plan. Many coverage issues depend on the features of the plan. We're already on the fifth proposed plan here. At the rate things are going, we could be on the thousandth and fifth plan. The reason that the motion to dismiss was right for adjudication and with respect should have been adjudicated is, as this court pointed out in SGL Carbon, if the Chapter 11 is not proceeding in objective good faith, that is, if there is no valid Chapter 11 purpose that under any facts it could achieve, it must be dismissed. And that is exactly what – that's exactly why the court didn't wait in SGL Carbon. Because their – Chapter 11 provides, consistent with the bankruptcy clause of the Constitution, very powerful tools for debtors at the detriment of creditors and private parties. And this court – Judge Lancaster specifically said, and I think this is maybe what Judge Fisher is alluding to, it's in my mind, he said there is a valid bankruptcy purpose. It's going to maximize the estate. If they are successful in the bankruptcy proceeding, they've got the assets represented by the insurance proceeds. If they don't, they don't. So it's like an on-off switch. They're either in the estate or they're not in the estate. And being in the estate is more than being not in the estate. End of discussion. What's particularly unique about this case is, as Skinner's own representative told the bankruptcy court, Skinner is, quote, gone, sold, disposed of. On the one side, you have the asbestos claimants. On the other, you have insurance. This has nothing to do with Skinner, close quote. The – what this is is an effort to obtain a bankruptcy advantage, an effort by the debtor on – the debtor's lawyers on the one hand, who will get 20% of the recoveries when they are entitled to nothing in bankruptcy or outside of bankruptcy, and the asbestos claimants' lawyers on behalf of 29,000 claimants who were given any number of opportunities by a federal district judge sitting in this district to come forward and make a minimal threshold showing that they had any exposure to asbestos. Aren't they still going to be required to do that? Well, they will – If you get to that point in bankruptcy, they're still going to have that burden. Well, if you get to this – this is independent of the point that there's no valid Chapter 11 purpose. That is, there's no possibility that anything that happens in this proceeding will affect the value of the liability insurance policies to the debtor. It is true that if you were to say, no, we don't agree with that, we don't care, we're going to let this go forward, there would be some form, who knows what form, a form of trust distribution process similar to what validly occurs when you have a genuinely reorganizing debtor under 524G of the Bankruptcy Code, where post-discharge there will be an operating company and where, unlike here, there is provision and reserve made for future claimants, not an effort by these parties to dissipate the insurance proceeds as quickly as possible. Mr. Waxman, though, is the answer to the question, yes, you'll still get protections within the context of bankruptcy the same as you would in the MDL? Absolutely not. Number one, in the tort system, we have, and were exercising at the time, a right to defend the claims. We had and don't have under this plan a right to introduce evidence, a right to appeal. We don't have the prospect of the application of a matrix to thousands of people that is blessed under something called. Are your contractual rights the same, though? I mean, I think I've heard you say your contractual rights are the same inside or outside bankruptcy. Is that right? Well, that's what we would assert in a. . . If that's true, how do you have standing under the Combustion Engineering Code? Well, we have standing the same way that Combustion Engineering found standing of some insurers to raise some claims and exactly the way this court ruled on standing in Congolium. It was specifically tied, was it not, to the decision by the Third Circuit that the district court in that case had did something which might be viewed as altering the rights of the insurance companies. Right. And they were only permitted to appeal as to that and only. . . And if they. . . And shifting that out of the way, they said, look, if the rights are the same inside or outside, no standing, didn't they? Well, what they said is that what they created was they said there is. . . There are two different groups of insurers. They have two kinds of issues. As to one, we are modifying. We are taking action. We are revoking one of the things the district judge said to make sure that even as a theoretical matter, there can be no possible difference. As to the other, there is standing, which is why there was standing in Congolium. In Congolium, the insurers objected to the district court's appointment of a particular lawyer as special insurance counsel. The objection was made that, come on, we don't even know what the plan is going to look like. We don't even know what judgments you supposedly are going to have to pay. We don't even know what the coverage litigation is going to look like. And this court unanimously said it's the insurers and only in the insurers, just like here, that have any incentive whatsoever to object. And because, this court said, the insurers' claims, quote, implicate the integrity of the bankruptcy proceedings as a whole, they directly affect the rights of the insurers who are being asked to fund the reorganization. And that's what's happening here. As the district court found, quote, the insurers are not tangential participants in the bankruptcy case. They are the sole pocketbook into which the debtors intend to reach. And so while it may be true that if and when this goes forward, some plan may be confirmed, and we are deemed to have some level, we will be able to argue whether we have contract coverage, we are presently harmed by the fact that we are in a proceeding in which we cannot defend, we cannot introduce evidence, we cannot appeal. There is the same present injury that there was in Congolese. Mr. Waxman, your time is up. I see that my grace period is. Subject to some questions that Judge Yon may have. Judge Yon. My concern with your position is that the bankruptcy court made no findings of fact. So that we're sort of operating in somewhat of a vacuum. Why wouldn't it make more sense to let the bankruptcy court first decide whether there is coverage, to have a chance to litigate that, and secondly then to decide what to do about a plan? Bankruptcy court might not approve the fifth plan or there might be a seventh or eighth or a thousandth plan, as you have mentioned, and see where we are at that point. Why wouldn't it make more sense to wait for those developments, as the bankruptcy judge said he wanted to do? Well, I think, Your Honor, for the reason that this court explained in footnote 19 in SGL Carbon, which is that if this proceeding manifestly cannot, under any set of facts that are realistic in this case, if it can't serve any valid Chapter 11 purpose, it doesn't matter what plan is proposed. It doesn't matter what the insurance policies do or don't provide. If this is not an objectively good faith proceeding, it must be dismissed. And we know from this court's jurisprudence and the Supreme Court's jurisprudence that in Chapter 11, the powerful tools of Chapter 11 are available for companies that plan to have a prospect of reorganizing or that will use a liquidation as an ongoing entity with a debtor in possession will maximize assets. And neither of those things can possibly be true here. The assets are what they are, and what they are proposing to do is to maximize liabilities. What is the purpose of maximizing the assets when you're liquidating? The purpose there is to benefit the creditors. That's correct. And the creditors here are all in favor of the plan. Well, the fact that the creditors are in favor of the plan simply reflects the fact that this is an agreement between there are insurance claimants who have not made the minimal showing in district court, have never asked to be relieved of the automatic stay. There are their lawyers. There are the debtor's lawyers, and there are the lawyers for the debtor and other. They are all going to do better at the expense of the insurance companies, and they're going to do that by increasing the liabilities of the debtor because the way liability insurance. I know that that's to the detriment of the insurance companies. If their claims are valid, they'll be found valid in the tort system as well, and the insurance companies will end up paying the maximum benefits. The point is that, I mean, let's take I think what the other side's briefs are really all about. 20% of the recoveries in this proposed plan are going to be skimmed off for people who have no right to recover in this bankruptcy and no right to recover in tort laws. The notion that the debtor's lawyers are getting 20% of the claimant's recoveries is the paradigmatic abuse of the bankruptcy process. This court made clear in integrated telling. Wasn't it done in a number of other cases? It has never been. With the insurance companies' consent? To my knowledge, it has not been done in any instance. I mean, I can't speak to all the 524G plans, but the point is that 524G is an incidence of an 1141D discharge in which, in order to preserve the goose that lays the golden egg, the reorganized company is entitled to come up with a channeling injunction that may include, as an administrative recovery, some fees for the debtor. This company not only liquidated, it already distributed all assets that can be distributed. The bankruptcy judge issued an order to show cause why this thing shouldn't be dismissed, and they said, well, give us a chance to come up with another plan. And we then filed, when they liquidated the assets and distributed it, we filed a motion saying, look, there is no possible legitimate bankruptcy purpose that can be served here. It is not the purpose of bankruptcy law to provide an alternative forum for dispute resolution for claimants who are dissatisfied with the tort system. The purpose of Chapter 11 is to address. Some have been looking for that for many years. Indeed, they have. But the point of the bankruptcy, Chapter 11, I don't think there's any. Who would be the defendant in the tort systems if Skinner ceases to exist? Well, it would be an issue of state law, but I believe in almost all, if not all states, it would be Skinner. And on a judgment against Skinner, there would be a direct recovery against whatever insurance existed. I mean, this happens all the time. All right, Mr. Waxman, I'm going to ask you to conclude. May I just finish the sentence I was addressing to Judge Yawn? You're already way beyond the time the Supreme Court used to give you when you were Solicitor General. I'll yield if the Court wishes. Otherwise, I'll finish my sentence. You can answer that question. I was saying that the purpose of Chapter 11 is not to provide an alternative dispute mechanism for claimants who are displeased with the manner in which their claims are going to be liquidated, however valid their unhappiness may be. Chapter 11 is designed to address a debtor's financial distress, and this debtor is not in financial distress for bankruptcy purposes. Thank you. We'll have you back for rebuttal. Ms. Edison, obviously we were fairly generous with the red light, and I indicated that we'll give you up to 10 minutes additional time if you would like to use it, particularly to address the jurisdictional issue, if you choose. Thank you, Your Honor. I don't know if that's what you were planning on addressing or that was someone else's. Actually, I'm here. I can say a few things about the Skinner Injun case. I can answer any questions that you may have. You have 23 minutes, I guess, on the clock, so go ahead with whatever. I'm absolutely happy. Does the Court have any questions for me about the Skinner Injun case or the plan of reorganization that's presently before the Bankruptcy Court that we'd like to get confirmed so that we can pay some claimants? My question has to do with why don't you pick up where Mr. Waxman left off. His assertion is that this is just, not to put too fine a point on it, an insurance scam to line the pockets of bankruptcy lawyers. You want to take that one head on? I'd love to take that one head on. All right. Let me tell you a little bit about this case. This case was originally filed in 2001 as a reorganization. It became apparent to the debtor that a reorganization wasn't possible and the best thing to do was to liquidate the assets. The debtor liquidated the assets in a manner that it thought was the best way to maximize the value of those assets, and it sold them then. It was then left with the problem of dealing with the many claims that are filed against it. When we talk about the claims, there's a misnomer that there's only two types of claims. There's asbestos claims and then there's administrative claims, claims of counsel against the estate, and that's really not true. If I go through the claims, we have administrative claims, certainly. We have administrative claims that are professional fees, but there are also administrative claims that are, say, utilities that provided electricity to the debtor on a post-petition basis, and those still need to be paid. We have priority claims, which are tax claimants. Let me ask it this way. I think if I understood Mr. Waxman's argument, he's saying these future claimants will have a right, would have a right, outside the bankruptcy context in the MDL to have the same recovery to the extent they're entitled to any that they would get inside bankruptcy, and the only difference is if they stay in bankruptcy, lawyers get a lot of money and there are transaction costs that wouldn't exist outside the context of the bankruptcy, and in that factual setting you can't say that it's a legitimate purpose of bankruptcy to stay in and funnel the claims through the bankruptcy estate. If I've got him, that's the pitch. That's the pitch. So that's what I'd ask you to respond to is where is the flaw in his argument? Well, there are costs associated with administering these claims no matter where they're administered. So if they're going to be administered in the MDL or they're going to be administered in state court, Skinner is going to incur costs defending those claims, and there is going to be an insurance coverage dispute, and Skinner is going to incur costs. We'll have to get counsel. So the costs are going to be incurred no matter where. With respect to future claims, future claims aren't being treated under this plan. It's now a liquidating 11. The debtor is not getting the benefit of the discharge. It's not a 524G plan. We tried to do a 524G plan because that would provide injunctive relief to the insurance companies that would protect them from future claims, but they didn't want a 524G plan, so we were left to do a 105 plan that doesn't address future claims. So those future claims are going to be dealt with outside the context of the bankruptcy. What the debtor is faced with is it has claims that it now is a fiduciary of the estate. The debtor has to administer the claims that were filed within the bankruptcy context, and the way the debtor is going to do that, the debtor has developed a plan of reorganization that is going to pay claims, not only asbestos claims, but it is going to pay non-asbestos claims, and it is only going to pay valid claims. So if there are no valid claims, no claims will be paid. Isn't the causation requirement a lot lesser in a bankruptcy proceeding than it would be in a tort system? Absolutely not. And why are the insurance companies worried about having a lot more successful claims in bankruptcy rather than the MDL claim? Well, I think that's a really interesting question. If you think about it, the debtor is protected by the automatic stay, and everybody is familiar with the automatic stay and what the automatic stay is. It essentially acts as an injunction. And these insurance companies are telling you that instead of they insure Skinner for Skinner's liabilities. So Skinner's liabilities are going to be adjudicated within the bankruptcy process. The insurers are telling you that instead of having the injunctive benefit of the automatic stay, they would rather have the asbestos claimants litigate their claims in the MDL. And we know that insurers often try to hold on to their money instead of paying claims. So they're telling you that the MDL. There's a lot more defense costs in the MDL. We'll have a lot more defense costs in the MDL. So they're telling you they would prefer the MDL to the automatic stay. And I think that's pretty instructive about what's going on with these claims in the MDL and what's happening in the claims in the bankruptcy process. And to address the actual payment and administration of the claims, the trust distribution procedures, we call it the CADP under the pending plan, is based on the revised John Mansville trust distribution procedures. So the claims that are going to be treated, or at least addressed within the bankruptcy context, have to meet a higher standard than the standard they would meet in the MDL. And the administrator, the individual who is going to administer the claims within the bankruptcy context, is number one going to be chosen by the bankruptcy judge, not Skinner. So the bankruptcy judge has to select the trustee. And then that trustee is going to administer the claims without Skinner being involved in the process. So Skinner, if the claims are valid, another party is going to do the administration. Skinner is not involved in determining whether these claims are valid or invalid. This case is here, as was discussed earlier, on an appeal from the denial of a motion to dismiss. Right. That's what's really in front of us. How do you show and have you shown that this bankruptcy has been filed in good faith? Absolutely. There is no dispute. Do you agree that you have that burden to show good faith? The bankruptcy court found that the petition was filed in good faith. The insurers admit that the petition was filed in good faith. There is absolutely no dispute that the petition was filed in good faith. And at the time the petition was filed, the debtor was in financial distress, and the debtor intended to reorganize. The issue is whether it's now in good faith. Well, the issue of good faith is tested at various points during a bankruptcy case. It's going to be tested at the plan phase. We're going to have to prove that this plan was proposed in good faith. They argue that there's nothing left in this estate except the claims by the asbestos claimants and the insurance policies. There's more than that. Well, there's $35,000. Yeah. We have $70,000. There's $35,000 that's going to be contributed to the trust, but there are other claimants. We have almost $5 million of trade claims in addition to the asbestos claims. There are taxing authorities. We have priority claims. We have wage claims. We have administrative claims. There's a lot more. There are more claims in this estate than simply asbestos claims. So it's about more than that. And this represents, this plan that is currently on the table, represents the best way that the debtor has to pay claimants. Every creditor supports this plan. Yeah, but their argument is you're going to take money out of their insurance policies to pay these other creditors. They're not. Their insurance policies say what they say. They will always say what they say. They have liabilities under those insurance policies. The terms of the policies are what they are. This plan does not modify the terms of their insurance policies. Doesn't that statement argue against your argument that this is maximization of the assets of the estate then? It maximizes. I think the exact quote is it maximizes property available to satisfy creditors, and that's what we're doing. Inside bankruptcy, we're able to satisfy creditors. We're able to pay creditors. So when you look at the case, I mean, when you look at it under that context, I think there's just clearly no issue that this case maximizes the value of the estate available to pay creditors' claims. That's what a bankruptcy does. Doesn't it give you a tactical advantage? It doesn't give us a tactical advantage. I spent a lot of time trying to figure out when we talk about what this tactical advantage is, and it's hard for me, even if I've read this and I've lived this case for years, it's hard for me to understand what this tactical advantage is. When I look at the motion to dismiss said that there was no bankruptcy purpose, that there was no cause for the case to be in bankruptcy, and that the debtor was bleeding cash. Well, that simply wasn't true. The debtor wasn't bleeding cash at the time the motion to dismiss was filed. In their succinct reply brief, they said that the bankruptcy was being used to gain an improper advantage over the insurers by the asbestos claimants, but that's not the debtor. That was the asbestos claimants. The debtor is faced with claims being filed against it and has to address the claims. Then in the supplemental brief in support of their motion to dismiss, they said that their advantage was that dubious claims were going to be allowed. All right, so we've just changed. I mean, in three different pleadings, we've changed what this advantage is. But I've told you that under the terms of the CADP, only valid claims are going to be paid. If there are no valid claims, then we're not here to pay invalid claims. We're simply here to pay valid claims. How much coverage is there? At one point in the papers, the number 140 million was mentioned. At another point, 30 million was mentioned. I know there's apparently some coverage disputes. My understanding of the coverage universe is that policies were issued by the insurance companies that total about 140 million in total coverage. 140, so that's about $4,000 per claim if there are 29,000 claims. I mean, that's assuming that all 29,000 claims are valid. Under the CADP, various claims' disease levels will be paid at different amounts. The mesothelioma claimants are the most sick. In fact, most of them are dead, if not all of them are dead. They will be paid more than other claims levels. In thinking about the CADP, I mentioned to you that it's the Johns-Manville level, or the Johns-Manville matrix that was used. I forgot to mention that Johns-Manville, I think, has nine or eight categories, and we took off the lowest category. So we are actually a lot more stringent. The lowest category doesn't exist. We eliminated that, the plural picketing category. As a practical matter, though, are you disagreeing with your opponents when they say that they're going to lack the same tools to contest asbestos claims in the bankruptcy context that they would have if they were in the MDL? I absolutely disagree with that. Be specific, please. Well, their policies are what they are, and they have whatever rights they will have under the policies, and the plan does not change that. But we have added a special section to the CADP, the distribution procedures, that we're going to establish as part of this plan, and we are permitting the insurers to participate in the claims analysis process. And all of that will be handled by the bankruptcy judge, by the claims administrator, and they will be allowed to participate in the process. Well, speak to the issue of standing, then, if you would. If it's true, as you say, that their procedural and substantive rights are going to be exactly the same in the bankruptcy context or outside the bankruptcy context, how can they claim to be agreed parties? If it's sixes for them, what gives them a right to be here arguing in bankruptcy at all? Well, I have to tell you that from a standing perspective, we don't believe that they have standing, but with the bankruptcy case and the way that it has transpired and the way we drafted the plan, even though we believe that they don't have standing and that their rights will be protected and they'll be able to participate in the coverage action and there is no injury, we have not argued the standing issue. That's what I'm trying to find out about. Yeah, we have not argued the standing issue because we believe, given the bankruptcy judge that we have and the procedures to date, what we really want to do is confirm a plan. And if we confirm a plan and they participate in the plan confirmation process, then we will address all of the issues that they have. We've tried to make this process as open as possible. That's why we have a couple of versions of the plan. We really only have two plans that the debtor has proposed to deal with these, to treat these asbestos claims. When we talk about the thousands plan, I think that's just... There's one plan. American Capital and Skinner, do they have separate plans? Excuse me? American Capital and Skinner, are there two separate plans? There's one plan. There's one pending plan of reorganization. All right. Anything else, Ms. Edison? I have nothing to add, Your Honor. All right, thank you very much. Thank you very much. We'll have Mr. Kelman. May it please the Court. Alan Kelman on behalf of the claimants. I requested a couple minutes just to address any argument that may have arisen with regard to the claims, because I represent the claimants. I don't think that, given the argument today and the papers and the status of the case, that I need to take the Court's time to get into discussing the merits of the claims. And unless the Court has any questions for me, I really have nothing to add to Ms. Edison's argument. Thank you, Mr. Kelman. Mr. Waxman. Let me see if I can address both Judge Jordan's question about standing and also this issue about what other assets there are in the estate and why this doesn't serve a valid bankruptcy purpose. One thing, there are not many things that all the parties can agree on in this case. But here's what we do agree on. Number one, this is all about our money. Number two, this plan will pay claims that otherwise will not be paid in the tort system. They told the bankruptcy judge that this was going to give them a, quote, maximizing the amount insurers would pay. The property, the asset. Why is that? Why will you have to pay more under the plan than you would in the MDL system? Because we are dealing with a situation in which, I mean, as I said, everyone agrees, of the 29,000 claims that Judge Wiener asked again and again and again and again, just give me the following and I will allow you to proceed. A handful of these cases, of these claimants, ever surmounted that. During the pendency of this bankruptcy, not one request has been made, although the bankruptcy judge invited it, for release from the automatic stay in order to allow them to proceed. And so if you look at what they call the three sets of claimants, the asbestos claimants, the trade creditors, and the administrative creditors, the latter two will be getting proceeds that they are not entitled to, period. And as to the former. Why are the asbestos claimants going to be able to be more successful in bankruptcy court, in your view, than they would in the MDL process? She told me the causation standard is the same. Well, first of all, for standing purposes, it doesn't matter whether they are or they aren't. They assert that they will. They say that's the reason that they want to proceed, and that gives us standing under any applicable rule. The reason that it is not true, again, goes to Judge Jordan's question where he said, well, is it true, you know, the contracts are what they are, but is it true that the way things will proceed in the MDL will be the same way that they will proceed here? And the answer is they aren't. Number one, there's no begating mechanism that Judge Wiener imposed doesn't exist anymore. Number two, we don't have, we can't exercise our contractual right to defend. We can't introduce evidence. We can't appeal whatever judgment, whatever approval the bankruptcy judge gives. Those are tangible rights that we don't have. That is, it seems to me, more than enough to establish our standing. And as I said, the one thing that we can all agree on, that the reason that they gave for this, for the third plan, the fourth plan, and the fifth plan, was to maximize the amount that the insurers will pay to asbestos claimants from which we can then get 20%. We don't have the plan in the record as far as I know. I believe that the record is pretty ample, and I believe we have it. But, of course, this really isn't an argument about the plan. I understand that, but I'm really trying to understand why your insurance company is opposed to this. Because if it's only $5,000 a claim, you're going to spend a lot more money defending those claims in the MDL litigation. Or are you just trying to delay the payment as long as you can because the MDL is a mess right now? Everybody understands that if this goes forward, where a matrix will be applied and we can't object to the amount that individuals get paid, we can't appeal anything the bankruptcy judge does, we are in a worse position. You said you couldn't offer evidence. Is that true? That is true. You're not allowed to offer any evidence at all? In the bankruptcy. If you think it's not, the disease is not caused by asbestos? We aren't participating in these administrative proceedings. We won't be participating. We can object to the bankruptcy judge to the classification of a particular person as having Category X and Y, but not to the amount of the damage or the amount that they will have to apply. Mr. Waxman, aren't you assuming what the nature of the administrative proceeding in bankruptcy is going to be? I mean, you're saying you won't be able to, but there's nothing in the record for us to look at to know whether that's true or not. There's no plan in place. There's no description of the trust mechanism, the administrative process. How do we know that when you say we won't have these rights that that's the case, except, you know, you're a good, honorable man, but how do we know that other than what you're telling us? The procedures are in the record. That is, the ones that have been proposed at page 1175 at SEEK in the joint appendix, but the point is… Absolutely. The point is, again, to reiterate SGL Carbon, no matter what plan it is, it isn't going to maximize assets. They've talked about, well, there's more in this bankruptcy than these policies. The policies are what they are. We have claims by people who provide heat. We have lawyers. We have insurers. Those aren't assets, and unless it maximizes the property of the debtor, yes, maximizes property of the debtor for the benefit of creditors, but the first step is, and I think Judge Fischer quoted this, it seems like a long time ago, the very before opening merits question is, the issue in the case is, to quote this court's precedence, will it maximize the value of the debtor's estate? And this can't as a logical matter. I have one follow-up, if I can, Mike. When you say it can't as a logical matter, I don't mean to be having you argue over the same ground again, but here's Judge Lancaster's comment, and I'm trying to help you understand, help me understand why it's not logical. He says, within the bankruptcy estate and all the creditors there are, this is an asset which would pour into the estate and, therefore, it would increase the value. And you say, oh, those other people have no right to it, but they're all voting for this, right? Of course. Okay, so if all the people in the context of bankruptcy are voting for it, and this would pour into it as opposed to not pouring into it, how is not having it in there the same as having it in there? There's nothing that is legitimately in there that isn't already in there. The insurance liability policies are what they are. They have a value to the debtor. They have a value to you. But you're assuming, you have taken it as a given, that the creditors cannot jointly come together and say, look, if these insurance proceeds were outside of bankruptcy, some of us would never see a penny of it. But inside bankruptcy, some of us will see a penny of it. And you know what? We're all together on this, and we say we'd rather have it in than out. Your argument assumes that they can't lawfully do that, right? Exactly. And as this Court said in Integrated Telecom, to satisfy good faith, a Chapter 11 proceeding, quote, must do more than merely invoke some distributional mechanism in the bankruptcy court. It must create or preserve some value that otherwise would be lost, not merely distribute to a different stakeholder outside bankruptcy. And this plan and no other plan that they can propose can possibly do that, because all the debtor wants to do is increase its liabilities. Wouldn't your arguments about bad faith or lack of good faith be more appropriately determined at the confirmation stage? Well, the answer is no. I don't think so, and it doesn't matter for the following reasons. There is a separate requirement in the statute, and again, this is in footnote 19 of SGL Carbon, that any plan that be proposed be proposed in good faith and satisfy good faith. But the independent requirement that a Chapter 11 proceeding itself objectively advance a legitimate Chapter 11 purpose exists prior to and independent of any particular plan, and that is the holding of SGL Carbon. Thank you. Mr. Waxman, thank you very much. We thank all counsel for excellent arguments, and we'll take the matter under advisement.